OPINION
Caren S. Coleman appeals from a judgment of the Montgomery County District Court, Area Two, Criminal Division, which found her guilty of domestic violence and sentenced her accordingly.
A complaint was filed against Coleman on January 12, 1998, alleging that she had committed domestic violence, in violation of R.C. 2919.25, and complicity to commit aggravated menacing, in violation of R.C. 2903.21 and2923.03. She entered a plea of not guilty and appeared for trial on April 9, 1998. Coleman was tried with co-defendant Joseph Anson, her boyfriend, who had been arrested on charges of assault and aggravated menacing for his involvement in the incident. The trial court found Anson guilty of aggravated menacing and Coleman guilty of domestic violence. The trial court sentenced Coleman to one hundred eighty days in jail, with one hundred fifty days suspended, placed her on probation for one year, ordered her to attend a batterer's group and to pay a fine, court costs, and a probation fee. Coleman raises two assignments of error on appeal.
 I. APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Coleman contends that her conviction was against the manifest weight of the evidence.
"Weight of the evidence concerns `the inclination of the greater amountof credible evidence, offered in a trial, to support one side of the issue rather than the other.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. On appeal, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. We give substantial deference to the trial court's determinations of witness credibility because the "decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." State v. Lawson (Aug. 22. 1997), Montgomery App. No. 16288, unreported.
The testimony at trial was as follows.
David Coleman ("David") testified that, at approximately 11:30 p.m. on January 10, 1998, Coleman had telephoned to check on their eight-year-old son, David Joseph ("Joey"), who lived with Coleman and was visiting David that evening. Joey talked to his mother and told her that he was upset because he did not want to put away his toys. Coleman cursed at David and told him that she would be over to pick up Joey. David decided to leave his house to avoid trouble with Coleman, left Joey there with his girlfriend, Piayun ("Sara") Wang, and walked along the street. David saw Coleman and Anson arrive at his house, and because they remained inside for about fifteen to twenty minutes, he thought that "maybe something was wrong," walked home, and sat down on a front step. When they came outside, Coleman approached him while "mumbling something," and "all of a sudden, [he] got punched in [the] face," causing him to suffer "a busted lip, busted nose." David testified that Coleman had been "in a violent rage wanting to fight [him]" and that he had been shocked and had reacted by calling Coleman a "bitch," grabbing her hair, and slapping her across the face. A few seconds later, Anson tackled him, got on top of him, and caused him to twist his ankle. Anson flashed a knife and told David that he wanted to kill him. While Anson held David on the ground, Coleman walked toward her car and told Anson to hold him. David was afraid that Coleman had brought a gun with her. David was able to run away to a neighbor's yard and to call the police when his girlfriend Wang came outside and pulled Anson off of him.
Anson's counsel cross examined David on his prior convictions for domestic violence, his recent unsuccessful attempt to have Coleman prosecuted for falsifying a check, and on the inconsistencies between his statement to the police and his direct examination testimony. He pointed out that, on the night of the incident, David had reported that Anson had hit him with his fists and had grabbed him in a bear hug and that Coleman had reached into the glove compartment and had told Anson to "hold him, hold him for me, Joe, and I'll get him." Coleman's counsel cross examined David on his prior inconsistent statement that Coleman had kicked him.
Wang testified that David had attempted to avoid a confrontation with Coleman and Anson by going outside before they had arrived at his house and that they had started searching for David immediately upon their arrival. Wang told them that David was not home, and Coleman became angry and started getting Joey ready to go. After Coleman, Anson, and Joey had gone outside, Wang heard yelling. Wang went outside and saw Anson and Coleman fighting with David and Anson pull a knife from his pocket and push David to the ground. According to Wang, Coleman told Anson to "get him," and Anson told Coleman to get a gun and told David that he wanted to kill him. While Wang was pulling on Anson to try to stop the fight, David was able to run away. Coleman then told Anson to get into the car because the police were coming. Wang admitted that she did not know how the fight had started because she had been inside the house.
James Coleman, David's neighbor, testified that he had been asleep on the couch that evening until "some wild commotion outside" at David's house had awakened him. James testified that he had not seen how the incident had started and had opened his door and had seen David walking down the street in front of his driveway away from Anson, who stood by the passenger door of Coleman's car yelling obscenities at David and screaming that he was going to kill David.
Officer Christopher Boyer of the Riverside Police Department testified that he had stopped Coleman's vehicle in the vicinity of David's house after hearing the dispatch on a "fight with a possible weapon involved, a handgun." Officer Boyer searched Anson and found a "pin knife" in one of his pockets. Another officer found a .22 automatic weapon in the car.
Officer Shelley Vance testified that she had been dispatched to David's home late that evening and had talked to David, Wang, and James Coleman. Wang appeared "very nervous," and David appeared "highly agitated" and "disturbed." The left side of David's lip area was "a little bit bloody, chewed, swollen, red." Officer Vance also went to the location of the stop of Coleman's car.
Anson's counsel cross examined Officer Vance on the inconsistencies between the statement that David had made on the night of the incident and his trial testimony. Officer Vance stated that David had told her earlier that he had been sitting "out front smoking a cigarette" when Coleman and Anson had arrived at his house, that Coleman had walked up to him and had kicked him in the mouth, that Coleman had continued kicking him after he had fallen sideways, that Anson had remained in the car, and that the car had been parked on the street. According to Officer Vance, these statements were inconsistent with David's trial testimony. She also stated that David had not initially remembered that Anson had flashed a knife until Wang had informed her about the knife.
Pursuant to Coleman's and Anson's Crim.R. 29 motions, the trial court dismissed the complicity to commit aggravated menacing charge against Coleman and the assault charge against Anson.
Anson testified that he and Coleman had been in David's house for only a few minutes and that he had told Coleman, "Let's just leave before [David] comes home so there won't be any trouble." After getting Joey ready to go, they went outside, Anson got in the front passenger's seat of the car, and Coleman put Joey in the back seat. As Anson was lighting a cigarette, Joey said, "Mommy's yelling ow, ow." Anson looked out the window and saw Coleman laying on the ground with David on top of her, beating her and grabbing her hair with both of his hands. Anson became "very, very angry" because Coleman had a brain tumor, got out of the car, grabbed David in "a bear hug," and rolled over onto his back with David on top of him. According to Anson, David hit him twice, and Anson then hit David to knock him off. Anson and David were struggling "in a bear hold" when Wang got in between them. They fell down in the yard, got up, and "wrestled over to the back of the Cadillac." Coleman and Wang pulled Anson and David apart, and David ran away. Anson denied having pulled a knife on David, but he admitted that he had told David that he would kill him although that had not been his intent. On cross examination, Anson stated that Coleman could have gotten into the car after putting Joey in the back seat rather than approaching David. He also admitted that he had not seen how the fight between Coleman and David had started because he had been lighting a cigarette when Joey had told him that Coleman was yelling.
Coleman testified that she had not kicked or punched David that evening and that she had not seen him, even though he had been sitting about a foot away from her car, until "he started screaming and cussing" at her while she was putting Joey in the back seat. Her version of the incident was as follows:
 While I'm putting Joey into the car and closing the door, I hear somebody telling me, you, bitch. I hate you. I kill you. It's Mr. Coleman. He's sitting on the step. I turn around and looked at him, and said, you ought not to be talking like that in front of our son.
* * *
 I went around and I said to him, you know, this is no way to talk in front of our son. I'm sick of this going on. This, to me, is child abuse. And that's when he grabbed me by both sides of my head and proceeded to beat my head into the steps.
David then pulled her down on one knee. She testified that, when Anson had grabbed David, she had run inside the house and had called 911. She then came back outside and helped Wang pull the two men apart. She then told Anson to get in the car and that she had already called the police. Coleman testified that David had pulled out "lots of strands of hair" and had injured her knee by pulling her down on a step. She testified that David had lied by testifying that she had punched or kicked him and that he had not grabbed her by both sides of her head.
Joey testified that he had seen his "daddy grab [his mother] by the hair" and that he had not seen his mother kick, push, or punch his father. He stated that he had told Anson that "[his] mom was screaming, and [his] dad had her by the hair."
The trial court found Coleman guilty of domestic violence based on its findings that, although David had "some real credibility problems," the "testimony of others clearly showed there had been blood about [David's] nose, which corroborates that there had been some kind of injury" and that David had tried to avoid a confrontation with Coleman and Anson by leaving his house before their arrival. The trial court stated, "If there had been some kind of violent propensity to take place, he would have sat there and waited on him, as opposed to walk[ing] away and coming back."
In our judgment, the trial court did not clearly lose its way in finding Coleman guilty of domestic violence. Although David's version of the incident differed from the version to which Coleman and Anson testified, the trial court was in a better position than ours to determine which story to believe. We agree that David's testimony was at times inconsistent with his previous statements to Officer Vance; however, the inconsistencies of which Coleman complains were over details of their altercation that did not make David's testimony completely unbelievable. Considering that the altercation occurred in a short period of time, inconsistent statements on the details of the fight did not require the trial court to conclude that Coleman had not attempted to cause or had not caused David physical harm. Furthermore, the trial court did not act unreasonably in finding that other witnesses' testimony corroborated David's assertion that Coleman had committed domestic violence him. Thus, Coleman's conviction for domestic violence was not against the manifest weight of the evidence.
The first assignment of error is overruled.
 II. APPELLANT WAS DENIED [HER] RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
Coleman contends that her trial counsel rendered ineffective assistance by failing to adequately cross examine David on the inconsistencies between his direct examination testimony and his previous statements to Officer Vance, by failing to cross examine Wang, Officer Boyer, and Officer Vance, and by failing to conduct a redirect examination of her. "Reversal of a conviction on the grounds of ineffective assistance of counsel requires that defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial." State v. Keith (1997), 79 Ohio St.3d 514, 518, citingStrickland v. Washington (1984), 466 U.S. 668, 687. A strong presumption exists that counsel rendered adequate assistance and exercised reasonable professional judgment. Strickland, 466 U.S. at 690. Prejudice is demonstrated by showing a reasonable probability that, but for counsel's unprofessional errors, the outcome of trial would have been otherwise.Id. at 694.
As a procedural matter, Anson's counsel conducted his cross examination of each witness before Coleman's counsel had the opportunity for cross examination. Anson's counsel thoroughly cross examined David and Officer Vance on the inconsistencies between David's statements and his direct examination testimony. Coleman's counsel asked David on cross examination about his prior statement to Officer Vance that Coleman had kicked him in light of his direct examination testimony that she had punched him. In closing, Coleman's counsel pointed out:
 [David's] complaint to Officer Vance that evening was that she kicked him and kept kicking him.
 In the written statement, he [sic] punched him and kept kicking him. When he gets up on the witness stand here today, there was no kicking at all. There was no punching. There was one punch. His testimony to the Court was she got in one good punch, and then I got her.
 It's impossible to sustain a burden of beyond a reasonable doubt due to the fact that Mr. Coleman himself apparently doesn't understand what happened. No other witness has testified to any contact initiated by Ms. Coleman against Mr. Coleman.
In our judgment, Coleman's counsel exercised reasonable professional judgment in declining to ask additional questions on David's lack of credibility considering that Anson's counsel had addressed David's inconsistent statements in his cross examination. Furthermore, Coleman's counsel did not act unprofessionally in declining to cross examine Wang and the police officers based on his determination that any questions that he would ask would be merely repetitive of Anson's counsel's cross examinations of them. Thus, Coleman's counsel did not act ineffectively.
The second assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Susan M. Brasier
James S. Armstrong
Hon. James A. Hensley, Sr.